IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 1, 2016

**ROCHELLE BUSH v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 08-05480    Paula L. Skahan, Judge
_____

**No. W2015-02391-CCA-R3-PC  -  Filed January 18, 2017**
_____

The Petitioner, Rochelle Bush, appeals the denial of her petition for post-conviction relief in which she challenged her concurrent sentences of ten years at thirty percent for her aggravated robbery conviction and twenty years at one hundred percent for her especially aggravated kidnapping conviction. On appeal, the Petitioner contends that she was denied her right to the effective assistance of counsel, which resulted in the trial court improperly enhancing her sentences. We affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Monica A. Timmerman, Memphis, Tennessee, for the appellant, Rochelle Bush.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Pam Stark, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

**Trial**

The facts underlying the Petitioner's convictions were summarized by this court on direct appeal as follows:

On August 14, 2008, the [Petitioner], Rochelle Bush, and her accomplice, Nicole Spates, were indicted on one count of especially aggravated kidnapping in violation of Tennessee Code Annotated section 39-13-305, and one count of aggravated robbery in violation of Tennessee Code Annotated section 39-13-402. The charges stemmed from conduct committed by the [Petitioner] and her partner at an IHOP restaurant on November 19, 2007.

At the [Petitioner]'s trial on September 6-9, 2011, the State presented the testimony of two witnesses. The victim, Ms. Moneeca Wells, testified that in November of 2007 she was working as a manager of an IHOP restaurant located in Shelby County in Memphis, Tennessee. She testified that she was five months pregnant at the time. The victim testified that on November 19, 2007, two women robbed her restaurant while she was working her shift.

The victim testified that she first encountered the two women when they came into the restaurant and approached her while she was standing near the restaurant's front register. The victim remember that "[w]hen they came in I tried to seat them and they w[ere] trying to s[i]t like close towards the office but that section was closed, so I sat them like over in the middle, and I just sat them and one of the servers waited on them."

The victim testified that she first realized that something was wrong when she went into the back of the restaurant, peeked behind the door to the restaurant's office, and saw that someone was standing behind it. The victim testified that she suddenly "realized maybe somebody was up to something and I tried to pull out [when] they pulled me into the office." The victim testified that after being pulled into the office she realized that there were two individuals standing inside—the same women she had seated earlier.

The victim testified that she "was thrown to the floor and somebody put their feet into my back and told me don't move." The women further told her that if she "move[d] they w[ere] going to stick me with a knife." The victim testified that the women tried to use pepper spray on her, but the spray did not hit her because she managed to cover her face with her jacket. The victim testified that the women asked her for the combination to the

-2-

restaurant's safe, which was also located in the office. The victim testified that the women threatened her life and repeatedly held a knife to her stomach (where her pregnancy was showing) and threatened to stab her there. The victim testified that the [Petitioner] was the one doing "all of the talking," while her partner "didn't say too much."

The victim testified that she gave the women the combination to the safe, and the women opened the safe and removed all of the money (including the rolled change). The victim testified that the women took approximately one thousand dollars from the safe. The victim testified that after they finished taking all of the money, the women spent approximately five additional minutes trying to pry loose a security camera. During this time, they kept the victim trapped under the office desk, and they threatened to kill her if she did not tell them where the videotape was located. The victim testified that she could not leave during this time period because the women were threatening to stab her, and they were holding a knife toward her stomach. Afterward, the women tied her up with her hands behind her back, and then they duct taped her mouth before running out of the office. As the victim was still freeing herself from the rope, another manager arrived. The police were called and arrived sometime thereafter.

The witness was shown, and she authenticated, video footage taken by two of the restaurant's surveillance cameras. This video footage was played for the jury. The victim testified that video from the first camera depicted the store's front register, and she identified the [Petitioner] and her partner as they approached her there. She further testified that the video depicted her seating the pair while they were "looking around." The victim testified that footage from the second video camera depicted the store's office. She identified the [Petitioner] and her partner entering that office, pointing at the safe, and then grabbing her as she approached them. The victim testified that the video further depicted the pair throwing her on top of a desk before instructing her to get underneath of it. The victim testified that video depicted the [Petitioner] putting her foot on her back. The victim also testified that the video depicted the [Petitioner]'s partner removing all of the money from the store's safe while the [Petitioner] held a knife to her stomach.

The victim testified that the video depicted the women continuing to threaten her with a knife after they had taken all the money out of the safe. The victim testified that the women were "trying to get the video to the camera, the videotape." The victim testified that the women told her that if

-3-

she did not tell them where the videotape was they would kill her. The victim testified that the video depicted a knife being thrust toward her at various points. The victim testified that the women demanded that she give them her identification, and after examining it for her personal information they told her that if she talked to anyone, they would come to her house and kill her. The victim testified that at this point, the women "pulled something loose" that was connected to the security camera, and the video feed cut off.

The victim testified that sometime after the robbery, she was taken to the police station and spoke with Sergeant Detective Lundy. She was shown several photographic arrays. She identified the [Petitioner] as one of the perpetrators from one of these lineups. While on the stand, the victim identified the particular photographic array containing the [Petitioner]'s picture that she had been shown by police. The victim testified that she had circled the [Petitioner]'s picture on this array, signed her name next to it, and written "had the knife, pull (sic) me on the floor, threatened me not to tell or they'll kill me." This photographic array was entered into evidence. The victim testified that during the course of the investigation, when she reviewed the video footage of the robbery, she recognized the [Petitioner]'s partner, Ms. Spates, because Ms. Spates had previously worked at the restaurant. The victim testified that she did not recognize the [Petitioner]'s partner during the actual robbery because she had worn a hooded jacket that partially obscured her face from view and had deliberately kept her back toward the victim.

On cross-examination, the victim testified that all of the money taken by the [Petitioner] and her partner on the day in question belonged to the IHOP restaurant, not to her. The victim testified that the video shown to the jury indicated that on the day of the robbery she had entered the restaurant's office at 6:34 a.m. The victim testified that the video stopped at 6:40 a.m. The victim testified that she was tied up after the video ended. She testified that after she was tied up and the robbers had departed she "sat there probably like two minutes before [she] started untying" herself. On re-direct examination, the victim testified that she did not want to be "under the counter" on the day of the robbery and that she would have left the office if she had been able to do so.

Sergeant Kevin Lundy testified that he was employed by the Memphis Police Department and that he had been an officer for twenty-three years. He testified that he investigated the robbery of an IHOP restaurant that occurred on November 19, 2007. In the course of that

investigation he showed the victim a photographic array containing a photograph of the [Petitioner]. Sergeant Lundy testified that the victim identified the [Petitioner] as one of the robbers.

Sergeant Lundy testified that he spoke with the [Petitioner] after she was in custody, and the [Petitioner] gave him an oral and written statement after being advised of and waiving her Miranda rights. The [Petitioner]'s written statement was admitted into evidence and read for the jury. In the statement, the [Petitioner] confessed to participating in a robbery of an IHOP restaurant with Nicole Spates on November 19, 2007, at approximately 6:00 a.m. The [Petitioner] denied possessing a weapon but acknowledged that her partner "had MACE." The [Petitioner] testified that she received $700 from the robbery, and her partner received approximately $200. When asked why she had participated in the robbery, the [Petitioner] responded: "Cause I'm crazy and stupid." Sergeant Lundy testified that the [Petitioner] read over her written statement after she gave it, and he witnessed her sign each page at the bottom.

Following this testimony, the State rested. The [Petitioner] was advised of and waived her right to testify in her own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999), and the defense rested. The jury was charged and the parties gave closing arguments. The jury retired to deliberate at 4:30 p.m. on September 8, 2011, and returned with a verdict of finding the [Petitioner] guilty as charged at 10:54 a.m. the following day.

*State v. Rochelle Bush*, No. W2011-02721-CCA-R3CD, 2013 WL 1197859, at *1 (Tenn. Crim. App. Mar. 25, 2013).

**Sentencing Hearing**

The Petitioner testified that prior to her arrest for the instant convictions, she had never before been arrested on felony charges. She admitted, however, that she had several driving with a suspended license charges on her record. She stated that she had never spent "significant time" incarcerated before and that the last time she was incarcerated was twenty-three months before the sentencing hearing. The Petitioner testified that at the time of the offenses, she was "very selfish" and "foolish" and that she now took "full responsibility" for her actions. She apologized to her family and the victim. The Petitioner acknowledged that she had a "drug problem" at the time of the robbery and kidnapping. She stated that she gave birth to a child while incarcerated for the instant convictions and that she had four other children. During her incarceration and

-5-

before the sentencing hearing, the Petitioner participated in several programs offered by officials at the jail. The Petitioner insisted that upon her eventual release from prison, she would not commit another criminal offense.

On cross-examination, the Petitioner testified that she did not know that the victim was pregnant and that she did not recall the victim informing her of the pregnancy. The prosecutor asked the Petitioner, "When [the victim] testified that she said I'm pregnant, [and] you said I don't care about your baby, she just lied …?" The Petitioner responded that she did not recall the victim testifying that she had told the Petitioner she was pregnant. She stated that she received $700 and her co-defendant received $200, explaining that her co-defendant did not need the money they stole because the co-defendant already had $1,500 in cash. The Petitioner admitted that her boyfriend was in jail at the time of the robbery and kidnapping and that her boyfriend "needed bond money." She admitted telling the victim that "while [she] might be a robber, [her] boyfriend is a murder," explaining that "[i]t was just a threat." The Petitioner stated that while out on bond for the instant charges, she became pregnant. She testified that she failed to appear in court following her release on bond because she waited until her child was born to avoid the State taking her child.

On re-direct examination, the Petitioner denied targeting the victim based on the victim's pregnancy.

During the State's argument at sentencing, the prosecution said the victim was "at least six months, maybe seven months" into her pregnancy at the time of the offenses, and the defense did not correct this characterization despite the victim's testimony at trial that she was five months pregnant.

The trial court applied three enhancement factors to both of the Petitioner's convictions: (1) the Petitioner "has a previous history of criminal convictions or criminal behavior," (2) she was a "leader in the commission of an offense," and (3) she "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114. The court found that although it was only applicable to the especially aggravated kidnapping conviction, "the offense involved more than one victim." *Id.* The trial court applied one mitigating factor to both of the Petitioner's convictions: the Petitioner's participation in the jail's rehabilitative programs. *Id.* § 40-35-113(13).

At the conclusion of the hearing, the trial court found that the Petitioner was a Range I offender and sentenced her to concurrent sentences of ten years at thirty percent for her aggravated robbery conviction and twenty years at one hundred percent for her especially aggravated kidnapping conviction. The trial court noted that the Petitioner and her co-defendant received the same sentences.

## Post-Conviction Hearing

Trial counsel testified that the Petitioner's testimony at the sentencing hearing was that she felt remorse, accepted responsibility, and asserted that her life changed following the robbery and kidnapping. Trial counsel recalled that the Petitioner was questioned about the victim's pregnancy. He testified that he did not believe the Petitioner was questioned about matters not discussed at trial, explaining that he did not make an objection to or raise on appeal the prosecution's examination of the Petitioner and her knowledge of the victim's pregnancy. Trial counsel also testified that although he did not review the trial transcript before the sentencing hearing, he had notes from the trial and explained that the trial transcript "would have been made available for the purposes of appeal."

On cross-examination, trial counsel said he could not recall whether testimony was presented at trial regarding how far the victim was in her pregnancy at the time of the offenses. He explained that the Petitioner's sentencing hearing was not the first time he remembered hearing proof on the matter and that he could have recalled proof on the matter from the transcript of the co-defendant's trial. He stated that the age of the victim's fetus was not relevant to the Petitioner's trial except as to "[*Blakely v. Washington*, 542 U.S. 296 (2004)] issues or things that were building toward sentencing."

The petition included a claim that the State committed misconduct at sentencing by falsely asserting that the victim had testified both that the Petitioner knew about the pregnancy and that the Petitioner told the victim she did not care about the baby. At the post-conviction hearing, the State clarified that the prosecutor was referring to a statement that did not come from trial but was instead drawn from a statement that the victim had given police. Trial counsel confirmed that prior to trial he had reviewed a portion of the victim's statement to an investigator in which the victim told police, "I was telling her I'm pregnant. I'm pregnant. And [the Petitioner] was like I don't care.…" He testified that the fetus was not a named victim. Although the Petitioner asserted that she did not know about the pregnancy, trial counsel testified that the victim gave a statement that "either [the co-defendant] or [the Petitioner] threated to specifically stick [the victim] and the baby" and that he did not wish for the jury to hear the victim testify to the statement. Trial counsel testified that the trial court did not enhance the Petitioner's sentence on the basis of her being the leader of the offenses. He noted that trial court reasoned that the co-defendants should be given the same sentence.

On redirect examination, trial counsel testified that at the sentencing hearing, the trial court heard the State's argument that the victim's fetus was "[n]ot quite seven months pregnant." He recalled that the video at trial showed the victim looking "pretty

pregnant." He testified, however, that the Petitioner's defense was that she did not know that the victim was pregnant.

The Petitioner testified that she believed trial counsel "could have spoke[n] a little more" at her sentencing hearing. She believed the prosecution "was using [her co-defendant's] past as if it was [her past]." She recalled that although the prosecution examined her about her "drug habit," she testified that she "was asking for help." The Petitioner said that although the victim testified that the Petitioner "should have known or seen [her pregnancy]," the victim was wearing an apron with a jacket on top. The Petitioner maintained that it was not obvious to her that the victim was pregnant.

The post-conviction court found that the trial court properly applied each of the enhancement factors it used in imposing the Petitioner's sentence, including that the Petitioner's crimes involved more than one victim—the victim's unborn fetus. With regard to the multiple victim enhancement factor, the post-conviction court found that the victim testified at trial that the victim informed the Petitioner of her pregnancy multiple times. Further, the post-conviction court found that, according to the victim's statement to the police, the Petitioner acknowledged that the victim was pregnant. The post-conviction court also noted that the video footage of the robbery and kidnapping "shows that the victim was visibly pregnant." The post-conviction court found that "there was ample evidence to support that [the] Petitioner was aware that the victim was pregnant." The post-conviction court concluded that trial counsel was not deficient in his representation and that any deficiency did not result in prejudice.

## ANALYSIS

The Petitioner argues that she is entitled to post-conviction relief based on ineffective assistance of counsel. She contends that trial counsel provided deficient representation "for failing to object to the State's misstatement of the facts regarding the victim's pregnancy and [the] Petitioner's knowledge thereof at the sentencing hearing." Accordingly, the Petitioner believes that the trial court then incorrectly found that there were multiple victims to the crime due to the victim's fetus and, thus, should not have enhanced her sentence using that factor.

In order to obtain post-conviction relief, the petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010).

-8-

The Post-Conviction Procedure Act provides relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel, and the denial of the effective assistance of counsel is a proper ground for post-conviction relief. *Vaughn v. State*, 202 S.W.3d 106, 11516 (Tenn. 2006). The right to counsel "encompasses the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Failure to show either deficiency or prejudice precludes relief. *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011). Deficiency can be shown by proving that counsel's acts or omissions were so serious that they fell outside an objective standard of reasonableness under prevailing professional norms. *Vaughn*, 202 S.W.3d at 116. "Upon our review of counsel's performance, 'we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time.'" *Finch*, 226 S.W.3d at 316 (quoting *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006)). In evaluating counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. The defendant's own statements and actions may determine the reasonableness of counsel's actions. *Felts*, 354 S.W.3d at 277.

Here, the Petitioner argues two claims of ineffective assistance of counsel. First, the Petitioner argues that trial counsel should have known that the victim was only five months pregnant based on her trial testimony, and, if he had objected to the State's argument during the sentencing hearing, the trial court would not have applied the "multiple victims" enhancement factor based on the viability of the fetus. Although the victim testified at trial that she was five months pregnant at the time of the crimes, the trial court found that she was six or seven months pregnant as argued by the State at the sentencing hearing. The Petitioner, relying on this discrepancy, argues in her brief that at five months old the fetus would be unviable and at six months old the fetus would be viable.

Second, the Petitioner argues that trial counsel should have known that there was no testimony that the Petitioner said she did not care about the victim's pregnancy and should have objected. She contends that if she did not know about the pregnancy, then the "multiple victims" enhancement factor could not have been applied. Trial counsel's failure to object was not deficient because the State had a good faith basis for asking about the Petitioner's knowledge based on the victim's statement to the police. *See State v. Nesbit*, 978 S.W.2d 872, 882 (Tenn. 1998) ("[T]he purpose of this requirement … is to ensure that such questions are proposed in good faith, rather than in an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors."). Accordingly, we are unable to hold that trial counsel provided deficient representation for the Petitioner.

To show prejudice, the petitioner must show a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. *Vaughn*, 202 S.W.3d at 116. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694).

We review the prejudice inquiry in light of our supreme court's decision in *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Under *Bise*, the trial court's decision regarding the length of a sentence for an abuse of discretion, granting a presumption of reasonableness to within-range decisions that reflect a proper application of the purposes and principles of the Sentencing Act. *Bise*, 380 S.W.3d at 707. In fact, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the Sentencing Act. *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

This court in *Frank J. Beasley v. State* faced a similar ineffective assistance of counsel claim where the petitioner was challenging his trial counsel's handling of his sentencing hearing. *See Frank J. Beasley*, No. M2013-00489-CCA-R3-PC, 2013 WL 5861797 (Tenn. Crim. App. Oct. 29, 2013). This court held that although the trial court "properly applied one enhancement factor and misapplied three enhancement factors," the petitioner failed to establish prejudice. *Id.* at *6. Accordingly, this court affirmed the sentences that the trial court imposed. *Id.* In reaching its conclusion, this court held that "[t]he misapplication of an enhancing or mitigating factor in sentencing does not remove the presumption of reasonableness from a trial court's sentencing determination." *Id.* (citing *Bise*, 380 S.W.3d at 709). Further, this court noted that "the trial court considered the purposes and principles of the sentencing statute and sentenced appellant to within-range sentences for [his convictions]." *Id.* (citing *Bise*, 380 S.W.3d at 709-10).

-10-

Although on different grounds, this court has already upheld the Petitioner's sentence on direct appeal. *See Rochelle Bush*, 2013 WL 1197859. The Petitioner's trial and sentencing hearing were held in 2011 and the direct appeal was decided in 2013. In this court's direct appeal decision, the court applied *Bise*, which was decided on September 26, 2012, and reasoned that "a trial court's complete misapplication of an enhancing or mitigating factor cannot provide a basis for reversal of a defendant's sentence." *Rochelle Bush*, 2013 WL 1197859, at *8.

The sentencing ranges that applied to the Petitioner's convictions were eight to twelve years at thirty percent for her aggravated robbery conviction and fifteen to twenty-five years at one-hundred percent for her aggravated kidnapping conviction. *See* T. C. A. § 39-13-305(b)(1); *id.* § 39-13-402(b); *id.* § 40-35-112; *id.* § 40-35-501. The trial court sentenced the Petitioner to ten years at thirty percent for the aggravated robbery conviction and twenty years at one-hundred percent for the aggravated kidnapping conviction, to be served concurrently. Thus, the trial court sentenced the Petitioner to mid-range sentences for both convictions.

Moreover, the Petitioner has failed to carry her burden for the prejudice prong of her claim. The trial court applied three other enhancement factors and one mitigating factor to both of her convictions, which the Petitioner does not challenge. Also, the "multiple victims" factor was not applied to the robbery conviction. Regarding the fetus's viability, we hold that the Petitioner did not establish prejudice. We also hold that there is no reasonable probability that any error affected the sentence because even if the trial court had committed error in finding that the victim was six months pregnant, the trial court properly applied three other enhancement factors and sentenced the Petitioner within the proper range. Regarding the Petitioner's knowledge of the fetus, we hold that the Petitioner has not established prejudice because the trial court properly heard testimony that she held the knife to the victim's stomach and the trial court viewed the security video footage which showed the victim to be visibly pregnant. Additionally, the trial court noted in its sentencing determination that it sought to sentence the Petitioner and her co-defendant to the same sentence because they were equally involved in the same crimes.

The Petitioner failed to present proof that she was prejudiced by the court's application of the multiple victims enhancement factor. *See Beasley*, 2013 WL 5861797, at *6. In other words, she failed to present evidence establishing that there was a reasonable probability of a different result had trial counsel objected to the aforementioned representations made by the State during the sentencing hearing.

-11-

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE